DECISION.
Defendant Ovell Hampton appeals from the judgment of conviction entered upon a jury verdict finding him guilty of abduction, along with a one-year firearm specification and a three-year firearm specification. Hampton advances nine assignments of error in support of this timely appeal.
In the predawn hours of December 14, 1999, Danyell Jenkins left her home in the drizzling rain and walked to a nearby bus stop on Langdon Farm Road to catch the 6:30 a.m. bus. Just after she had passed the intersection of Langdon Farm Road and Rhode Island Avenue, a man standing across the street from her asked her if she needed a ride. Using her peripheral vision, Jenkins noticed that the man was standing next to a pay phone and a dark-colored minivan. In response to his offer, Jenkins declined and kept walking to her bus stop. When she reached her stop, she dug into her purse for change. Moments later, she looked up and observed a dark-colored minivan turn left from Langdon Farm Road onto Rhode Island Avenue. She thought that the minivan was the same one that she had just seen parked next to the pay phone.
Soon, a man coming from the direction of Rhode Island Avenue approached the bus stop and stood behind Jenkins. He began asking her questions. When he asked Jenkins her name, she turned around and briefly looked at him to see if she knew him. The man then walked into the middle of the street and started looking around. When he returned, he asked her what time the bus would be arriving. She told him, "Soon." He then walked into the street a second time and looked around again. When he returned to the bus stop, he stood immediately behind Jenkins. Fearing the man was trying to steal her purse, Jenkins secured her purse and began walking towards another bus stop. After she had taken three or four steps, the man grabbed her and demanded that she walk with him to his van. When she tried to get away, he told her that he had a gun to her back and not to scream. She felt something poking her back, and she began to cry as he pulled her along the sidewalk in the direction of Rhode Island Avenue. Still struggling to get away, Jenkins eventually slipped on the slick sidewalk. The man dragged her by her coat with both of his hands while she struggled. Jenkins did not see anything in his hands. At this point in time, Leatrice Bishop, a high-school senior, approached the area.
Seeing Bishop, the man dropped Jenkins and walked quickly away. Bishop had seen the struggle from a distance and thought the man had been holding a gun, but she was not "100 percent" sure. Others passing by came to Jenkins's aid and walked her home. Bishop continued down the road to her school bus stop. Two minutes later, a maroon minivan pulled into a driveway along Bishop's pathway. She was walking behind the van when the man called to her from his rolled-down window. He called out, "Hey, girl" and "Come here." Bishop recognized him as the man she had seen struggling with Jenkins several minutes before. She began walking faster and caught up with the schoolmate who had just walked Jenkins to her home. After reaching her bus stop, Bishop saw the man again, sitting in his van in a nearby parking lot. He started the van and drove off.
Jenkins was immediately interviewed by the police and described her assailant as a black male with long dreadlocks and a knit cap. The cap held the dreadlocks close to his face. At the time of her interview, Jenkins did not describe the man as having facial hair. Working with a sketch artist, she assisted the Cincinnati police in creating a composite picture of her assailant. The composite showed a man without facial hair.
Cincinnati Police Detective Darlene Lackey interviewed Jenkins several hours after the incident. She produced a flyer containing the composite of the suspect and a description of the minivan. She distributed the flyer to the police districts and to "Crimestoppers." She received numerous calls from "Crimestoppers" informing her of a man meeting the description of Jenkins's assailant approaching other young female subjects in the area. One caller provided a license-plate number. After tracing the license-plate number to Hampton's wife, Detective Lackey retrieved a photograph of Hampton. The photograph depicted Hampton with a full beard and mustache. After entering Hampton's physical characteristics from the photograph into the computer and retrieving the photographs of five other similar-looking men, Detective Lackey then generated a six-photo array. When shown the array, Jenkins immediately pointed to Hampton as her assailant and began to shake. Bishop also immediately chose Hampton's photograph after being shown the array. At trial, both women unequivocally identified Hampton as the perpetrator, and both remembered that he did have facial hair at the time of the abduction.
Hampton was eventually arrested for the abduction. After waiving hisMiranda rights, he was interviewed by Detective Lackey. He denied any knowledge of or participation in the abduction, but admitted that he had lived near the bus stop and often drove through the area between 6:00 and 6:30 in the morning. He also informed Detective Lackey of several extramarital relationships in which he had been involved, describing how he had randomly approached the women, had begun talking to them, and had eventually asked for their phone numbers.
Hampton was indicted on a single count of abduction. The charge carried two firearm specifications. Prior to trial, Hampton filed a motion to suppress Jenkins's and Bishop's in-court identification of him, arguing that their in-court identification would be based upon an impermissible and suggestive identification procedure conducted by Detective Lackey. After a hearing, the trial court denied the motion to suppress.
Hampton was then tried before a jury, which found him guilty of abduction. The jury originally acquitted Hampton on the one-year gun specification and found him guilty on the three-year specification. But the court declined to accept those verdicts and sent the jury back to continue its deliberations. Subsequently, the jury returned verdicts of guilty on both gun specifications, and the trial court imposed the maximum term of five years of imprisonment for the abduction and ordered that the three-year mandatory term of imprisonment for the three-year firearm specification be served consecutively.[1]
 I.
In his first assignment of error, Hampton challenges the trial court's failure to suppress the identification testimony of Jenkins and Bishop. We are unpersuaded.
In determining the admissibility of challenged identification testimony, courts apply a two-part test. First the defendant has the burden of demonstrating that the identification procedure was unnecessarily suggestive.[2] If the defendant meets this burden, then the trial court must consider whether the procedure was so unduly suggestive as to give rise to a very substantial likelihood of irreparable mistaken identification.[3] Even if the procedure itself is suggestive, the challenged identification is admissible as long as it is reliable.[4]
In determining whether identification testimony is reliable, factors to be considered include (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.[5]
Reliability is determined from the totality of the circumstances.[6]
Hampton argues that the identification procedure used by Detective Lackey was unduly suggestive for two reasons. First, Jenkins and Bishop described the assailant as not having facial hair, but all of the men in the photo array were pictured with facial hair. Second, the composite prepared by a police artist based upon Jenkins's description did not resemble Hampton and was not used to generate the photographs shown as part of the photographic array.
We reject Hampton's arguments. Lackey used a photograph array depicting six men with facial hair, not just Hampton. Further, the state presented testimony that composite sketches were generally a starting point for an investigation and did not always match exactly the person who was later identified. We hold that Hampton failed to meet his burden of demonstrating that the identification procedure was unduly suggestive, and, therefore, his protests go merely to the weight of the identification testimony.[7]
We hold also that the photographic array shown to Jenkins and Bishop did not compromise the reliability of their in-court identification of Hampton. Jenkins immediately identified Hampton after viewing the array and began shaking. She unequivocally identified Hampton at trial. She testified that she had tried not to look at him during the encounter, but that she had squarely seen his face at close range. She was able to notice his "red eyes," despite the lack of daylight or direct illumination from a streetlight. Finally, she consistently described her assailant as having dreadlocks pushed into his face by a skull cap. This description was sufficiently accurate to demonstrate the reliability of her in-court testimony.
Likewise, we hold that Bishop's identification was reliable. Bishop did not testify at the suppression hearing, but her trial testimony demonstrated that she had viewed the assailant, first, from a distance and, later, close up. She unequivocally identified Hampton as the assailant both when shown the photo array and while testifying in court.
After reviewing the circumstances surrounding the identification of Hampton, we are not convinced that there was "a very substantial likelihood of irreparable misidentification." The jury was fully apprised of the facial-hair discrepancy and was free to weigh the evidence as it saw fit.[8] We, therefore, overrule Hampton's first assignment of error, because the record does not support a conclusion that, under the totality of the circumstances, the identification procedure was unduly suggestive or that it created a substantial likelihood of irreparable misidentification.[9]
 II.
We next address Hampton's fourth assignment of error, which concerns the court's instructions to the jury on the firearm specifications. We find this challenge to be well taken.
After instructing the jury on the abduction charge, the trial court stated to the jury that if it found Hampton guilty of abduction, then it had to decide his guilt or innocence on each of the two firearm specifications. Then, without objection, the trial court merely read to the jury the specifications as stated in the indictment, which reflected the statutory language of R.C. 2929.14(D)(1)(a)(ii) and (iii), R.C.2941.141, and R.C. 2941.145.[10] As to the one-year specification, the court delivered the following instruction:
 If you find the defendant guilty of abduction, it is your duty to deliberate further and decide an additional factual question which we will call a specification, that is, whether the state has proved beyond a reasonable doubt that the defendant is guilty of having on or about his person or under his control, a firearm while committing the offense of abduction alleged in count 1.
 The trial court then separately instructed the jury on the three-year specification:
 If you find the defendant guilty of abduction, it is your duty to deliberate further and decide an additional factual question, which we call a specification, this is, whether the State has proved beyond a reasonable doubt that the defendant is guilty of having on or about his person, or under his control, a firearm while committing the offense of abduction and displayed the firearm, brandished the firearm, indicated that he possessed a firearm or used it to facilitate the offense as alleged in count 1.
 Importantly, the court did not instruct the jury that the operability of the firearm was an element of the offense, nor did the court define "operability."
Under Ohio law, a firearm is defined by its operability. R.C.2923.11(B)(1) defines a "firearm" for purposes of the specification statutes at issue here as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant." The statute then provides as follows: "`Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." In arriving at its decision concerning whether an accused was in possession of a firearm and whether it was operable or readily capable of being rendered operable at the time of the underlying offense, the finder of fact may consider all relevant facts and circumstances surrounding the crime.[11] Those circumstances comprise the "representations and action of the individual exercising control over the firearm,"[12] including any implicit or explicit threat made by the accused to discharge the firearm.[13]
Conceding that defense counsel made no objection to the charge, Hampton urges this court to find plain error. Plain error should be found only in exceptional circumstances.[14] This court may notice plain error only where there has been a deviation from a legal rule that is an "obvious" defect in the trial proceedings, and where the error has affected "substantial rights," meaning that "the trial court's error must have affected the outcome of the trial."[15]
A defendant is entitled to have the jury instructed on all elements that must be proved to establish his guilt of the crime with which he is charged.[16] The Ohio Supreme Court has held that, in order to convict an accused of a firearm specification, the state must present evidence beyond a reasonable doubt that a firearm was operable or capable of being rendered operable at the time of the offense.[17] It follows, then, that the trial court must instruct on operability.[18]
The trial court's failure to instruct on operability in this case was an obvious deviation from the legal rule.[19] But, the "[f]ailure of a trial court to separately and specifically instruct the jury on every essential element of each crime with which an accused is charged does notper se constitute plain error under Crim.R. 52(B)."[20] We must "examine the record in order to determine whether that failure may have resulted in a manifest miscarriage of justice."[21] Reversal is warranted only if the outcome of the trial would have been different in the absence of the error.[22]
The record reveals that, in this case, Hampton challenged the operability of the gun, and that the evidence in support of operability was weak. Operability is often proved by the defendant's implicit or explicit threats to discharge the firearm at the time of the offense.[23]
On direct examination, Jenkins testified that her abductor had told her that he had a gun to her back and not to scream. She felt something poking her back, but never saw a gun. On cross-examination, defense counsel asked Jenkins if her abductor had made any comments about shooting her, to which she replied, "No." The other witness to the crime, Bishop, testified only that she thought she had seen a gun, but that she was not "100 percent" sure. She did not testify about hearing any threats. In light of the weak evidence presented in support of the firearm specifications, particularly the operability element, we hold that the trial court's failure to instruct the jury on the operability of the firearm raises substantial doubts about the reliability of the verdicts finding Hamton guilty on the firearm specifications. If the jury had been properly instructed, it may very well have found that Hampton was not in possession of an operable firearm and acquitted him of the specifications.
We, therefore, hold that the failure to instruct on operability constituted plain error, and, on that basis, we sustain Hampton's fourth assignment of error.
 III.
In his fifth assignment of error, Hampton alleges that the trial court abused its discretion by sending the jury back to deliberate further after it had returned its original verdicts. In his sixth assignment of error, argued with the fifth, Hampton claims the trial court erred in overruling his motion to set aside the verdicts. We address these assignments separately, and finding only the fifth assignment of error meritorious.
The trial transcript reveals that the jury originally returned verdicts finding that Hampton was not guilty of the one-year firearm specification, but guilty of the three-year specification. Defense counsel then asked to submit an interrogatory to the jury. The trial court subsequently permitted defense counsel to ask the jury the following question: "Did you find that he did not actually have a firearm on his person, but simply indicated that he did?" The jury foreman answered, "Correct." The trial court told the jury that Hampton "either had a gun or he didn't" and asked the foreman if the jury wished to go back and continue deliberations. The foreman answered in the affirmative, and the trial court sent the jury back to deliberate again. During this time, defense counsel asked the court to set aside the verdict on the second firearm specification, but the court declined. The state asked the court to accept the original verdicts. When the jury came back, the foreman informed the trial court that the jury was split on the firearm specifications. At that point, the trial court gave the jury the Howard
charge and instructed it that it could stand on its original verdicts or re-examine them and come back with new verdicts. Shortly thereafter, the jury came back with a new verdict finding Hampton guilty on both firearm specifications. Defense counsel again asked the court to set aside the verdict on the three-year firearm specification. The court again refused.
On appeal, Hampton argues that the trial court was required to accept the jury's "special" finding that he did not have a gun and to acquit him on both gun specifications. The state argues that defense counsel's question to the jury was, in effect, a poll of the jury, and that, in light of the foreman's undermining response, the trial court then had a duty to send the jury back for additional deliberations.
We disagree with both arguments. The trial court erred in allowing defense counsel to impeach the verdicts with a "special" finding. Crim.R. 31(A) does not provide for such a procedure.[24] Further, "a firmly established common-law rule flatly prohibits the admission of jury testimony to impeach a jury verdict."[25] Reflecting that principle, Evid.R. 606(B)[26] restricts a juror's competency to testify about his mental processes in connection with the jury deliberations. Under these facts, the foreman was incompetent to offer such testimony.
The trial court compounded this irregularity by sending the jury back to deliberate again. Without any competent evidence that the first verdicts were not the unanimous decisions of the twelve jurors, the trial court should have journalized them, thereby finding Hampton guilty on the three-year firearm specification and acquitting him on the one-year specification. Accordingly, the fifth assignment of error is sustained.
We now address the sixth assignment of error. In his motion to set aside the verdicts, Hampton argued that the verdicts on the firearm specifications were inconsistent, requiring the trial court to vacate the conviction on the three-year specification. We have found no case law discussing whether an inconsistency in firearm-specification verdicts requires the trial court to vacate a conviction. As to the law of inconsistent verdicts, the Ohio Supreme Court has stated that "the several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count."[27] With respect to inconsistent responses to the same count, such as a conviction on a principal charge and a concurrent acquittal on a specification for identical behavior, the Ohio Supreme Court in State v. Perryman[28] has held that the general verdict is not invalid. The Perryman court relied in part on the fact that a conviction on the principal charge was not dependent on a finding of any specification.
We apply the Perryman rule to the two specifications at issue in this case. The trial court instructed on the specifications separately and independently. We do not speculate as to why the jury acquitted on the first specification and returned a guilty verdict on the second, but we instead preserve the sanctity of the jury verdicts. In rejecting a claim that allegedly inconsistent verdicts entitled the defendant to be discharged, the United States Supreme Court in Dunn v. United States[29]
stated, "`The most that can be said in such a case is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'"[30] The Dunn court reasoned that inconsistent verdicts may work against the government as well as the defendant and, therefore, should not be used to grant the defendant a windfall when one cannot know the basis of the jury's conclusions.[31]
Accordingly, the sixth assignment of error is overruled.
 IV.
In his second assignment of error, Hampton alleges that he was denied the effective assistance of trial counsel. In order for an accused to prevail on a claim of ineffective assistance, he must first demonstrate that counsel's performance failed to meet an objective standard of reasonable representation.[32] "This requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."[33] Next, the defendant must show that, as a result of the deficient performance, he was prejudiced.[34] Prejudice is demonstrated by a showing of a reasonable probability that, but for trial counsel's deficient performance, the result of the proceeding would have been different.[35]
A reasonable probability is a probability sufficient to undermine the confidence in the outcome of the trial.[36]
Judicial scrutiny of defense counsel's performance must be highly deferential. Accordingly, "a court must indulge in a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."[37]
Hampton alleges the trial counsel was deficient in failing to request complete jury instructions on all the elements of the firearm specifications. If we were to sustain this challenge, we could afford Hampton no more relief than that resulting from our disposition of the fourth and fifth assignments of error. Therefore, the second assignment of error, to the extent that it challenges counsel's performance relative to the firearm specifications, is moot.
With regard to the abduction conviction, Hampton cites to three instances of counsel's deficient performance that, he alleges, undermines confidence in that conviction.
He first takes issue with defense counsel's failure to object to Detective Lackey's testimony concerning information that she had received from anonymous individuals through the "Crimestoppers" hotline. Detective Lackey testified that, after distributing a composite picture of the suspect to "Crimestoppers," she received numerous telephone calls informing her that a person matching Hampton's description and driving a dark minivan had approached other young female subjects in the same area. One anonymous caller produced a license-plate number of the minivan, which Detective Lackey discovered was registered to Hampton's wife. Armed with this information, Detective Lackey testified, she was able to obtain a photograph of Hampton showing him with facial hair, which she placed in an array with five other photographs of similar individuals.
On cross-examination, defense counsel asked Detective Lackey if she had filed any additional charges against Hampton as a result of the "Crimestoppers" tips. After the detective answered that she had not, defense counsel then asked, "[S]o is it safe to say none of those people described to you any criminal activity of any sort? * * * None of them said: I was abducted at gunpoint? None of them said: I was restrained? I was forced to go into this van?" Detective Lackey answered, "[C]orrect."
On redirect, the state was permitted to offer detailed evidence, over the objection of Hampton's counsel, regarding the information gleaned from the "Crimestoppers" hotline. This evidence was clearly offered for its truth and amounted to character evidence and other-acts evidence against Hampton. The trial court ruled that defense counsel had opened the door to this type of testimony on cross-examination and overruled defense counsel's request for a mistrial or, in the alternative, for a specific limiting instruction.
Hampton argues that defense counsel's performance was deficient because Detective Lackey's initial testimony concerning the "Crimestoppers" calls would have been inadmissible if an objection had been made. Further, defense counsel failed to request a limiting instruction directed to this initial testimony.
We need not decide whether defense counsel was deficient in this regard, because Hampton cannot show the prejudice necessary to prevail on an ineffective-assistance claim. Hampton's trial counsel elicited from Detective Lackey, upon cross-examination, that none of the "Crimestoppers" informers had reported the commission of any actual crimes. Further, none of the hearsay pertained to the attempted abduction charge Hampton was facing. Finally, the record in this case contains overwhelming evidence to support the jury's decision on the abduction charge such that we are convinced the inadmissible evidence did not taint or undermine the jury's determination. Both the victim and an eyewitness unequivocally identified Hampton in a photo lineup and at trial, and Hampton drove a van matching the description of the van driven by Jenkins's assailant.
Next, Hampton protests his trial counsel's failure to object to the admission of, or to move to redact at trial, those portions of his prior recorded statement in which he had recounted extramarital relationships and the details of how he had met these other women who were originally strangers to him. He maintains that these statements were inflammatory and inadmissible under Evid.R. 404. This rule of evidence forbids the introduction of character and other-acts evidence for the purpose of providing circumstantial proof of the defendant's propensity to act in accordance with his character in the case at hand.
Upon review of the record, we conclude that trial counsel's decision to allow into evidence the challenged portions of Hampton's statement without an objection was tactical. Courts must give wide latitude to defense counsel in developing a defense and in attempting to undermine the state's evidence.
In this case, the evidence against Hampton as the abductor was overwhelming. Hampton was positively identified by the victim and an eyewitness. He was also connected to the crime by virtue of the fact that he lived several blocks from the crime scene and had access to the type of vehicle operated by the perpetrator. Further, he admitted to the police that he often drove the maroon minivan near the crime scene between 6:00 and 6:30 in the morning.
Defense counsel used Hampton's statements to paint the picture of a noncriminal womanizer who asked for the phone numbers of women around town and particularly in the area of the attempted abduction. Counsel's strategy was illustrated in closing argument where counsel raised the possibility that Jenkins and Bishop could have previously seen Hampton driving his maroon minivan and that was why they had wrongly identified him as the perpetrator. In light of the facts of this case, we hold that defense counsel's decision was tactical, and, therefore, her performance was not deficient in failing to challenge the admission of those portions of Hampton's statement.
Hampton also contends that his trial counsel was ineffective for not requesting a limiting instruction to inform the jurors about how to consider the other-acts evidence that came in through his taped statement. Because this evidence did not demonstrate any criminal acts by Hampton, it was legitimate trial strategy not to draw further attention to it. Under these circumstances, counsel's failure to request the limiting instruction did not constitute deficient performance.
In summary, we hold that Hampton has failed to demonstrate that defense counsel's performance prejudiced him such that confidence in the abduction conviction has been undermined. Accordingly, the assignment of error is overruled with regard to the abduction conviction.
 V.
In his third assignment of error, Hampton alleges that the trial court abused its discretion in overruling his motion for a mistrial after Detective Lackey testified on re-direct. As discussed above, on redirect examination, Detective Lackey testified over defense counsel's objection to the specific details of the "Crimestoppers" tips she had received. This hearsay testimony went beyond what was necessary for Detective Lackey to explain her course of action, but it centered mainly on the basic description of a maroon van being driven by a man who would ask young girls their names and invite them to get in the van. In light of the other overwhelming evidence of Hampton's guilt, we hold that the testimony was not so damaging as to render the trial fundamentally unfair. Accordingly, we find no abuse of the trial court's discretion in denying Hampton's motion for a mistrial,[38] and we overrule the assignment of error.
 VI.
In his seventh assignment of error, Hampton challenges the sufficiency of the evidence to support his conviction and argues that the trial court erred in denying his Crim.R. 29 motion for acquittal. In the eighth assignment of error, he challenges the weight of the evidence. We review these assignments of error together.
A court shall not grant a Crim.R. 29 motion for a judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.[39] Furthermore, "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[40]
In reviewing a challenge to the weight of the evidence, an appellate court, "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."[41] Further, it is important to keep in mind that, on the trial of a case, the weight to be given the evidence and the credibility of the witnesses are matters to be determined by the factfinder.[42]
Hampton was convicted of the crime of abduction, which is defined in relevant part as follows: "No person, without privilege to do so, shall knowingly * * * [b]y force or threat, restrain the liberty of another person, under circumstances which create a risk of physical harm to the victim, or place the other person in fear."[43] As we discussed above, the state presented overwhelming evidence identifying Hampton as Jenkins's abductor. Accordingly, we find his challenge to the sufficiency and weight of the evidence to support the abduction charge meritless.
Hampton also challenges the sufficiency and weight of the evidence to support the firearm specifications. Again, if we were to sustain the weight and sufficiency challenges to the one-year firearm specification and the weight challenge to the three-year specification, we could afford Hampton no more relief than that resulting from our disposition of the fourth and fifth assignments of error. We, therefore, confine our analysis to the question of whether the state adduced legally sufficient evidence to support the verdict on the three-year firearm specification.
In order to meet its burden on the three-year firearm specification, the state was required to present evidence that Hampton had a firearm on or about his person or under his control while committing the offense, that the firearm was operable or readily capable of being rendered operable, and that Hampton displayed the firearm, brandished the firearm,
indicated that he possessed the firearm, or used it to facilitate the offense.
Our review of the record convinces us that the state's evidence on the three-year firearm specification was sufficient to withstand a Crim.R. 29 challenge. According to the evidence, Hampton grabbed the victim, placed something hard in her back, told her that he had a gun and ordered her to walk towards his van. A passerby observed these events and testified that it appeared that Hampton held a gun to the victim's back.
Based upon this evidence, reasonable minds could have differed as to whether Hampton had used an operable firearm or one easily rendered operable while committing the offense of abduction, and that he had indicated that he possessed a firearm or had used it to facilitate the offense. In State v. Thompkins,[44] the Supreme Court of Ohio affirmed a conviction on a firearm specification where the threats to the victim were implicit in nature rather than explicit. There, the evidence established that Thompkins had pointed a gun at the victim and had told her that he was committing a holdup and to be quick. The court concluded that the jury could have reasonably concluded, based upon the totality of the circumstances, that Thompkins had possessed an operable firearm.[45]
We hold here that the state presented legally sufficient evidence to warrant submission of the three-year firearm specification to the jury. Accordingly, the seventh and eighth assignments of error are overruled.
 VII.
In his ninth assignment of error, Hampton argues that the trial court erred in imposing the five-year maximum sentence of imprisonment for abduction. In imposing the maximum sentence for a third-degree felony, the trial court made all the necessary findings, and those findings were supported by the record. In imposing the maximum term, the trial court cited Hampton's lengthy prior record, including more than three prior prison terms, and the fact that he was on parole at the time of the offense. Accordingly, we overrule Hampton's ninth assignment of error.
 VIII.
In summary, we have sustained Hampton's fifth assignment of error upon our determination that the trial court erred in failing to accept and enter judgment upon the jury's original verdicts on the firearm specifications, when there was no competent evidence that those verdicts were not the unanimous decisions of the jurors. Upon those verdicts, Hampton was found guilty of the three-year specification, but not guilty of the one-year specification. Even though no sentence was imposed for the one-year specification, no further proceedings may be had upon it except for the appropriate recording on remand of the jury's original acquittal.
We have also sustained the fourth assignment of error upon our determination that the trial court's failure to instruct the jury on the firearm's operability constituted plain error. We, therefore, reverse the judgment of conviction on the three-year firearm specification and remand this case for further proceedings consistent with law and this Decision.
As to the balance of the judgment of conviction, it is affirmed.
Judgment affirmed in part and reversed in part, and cause remanded.
Painter, P.J., Hildebrandt and Gorman, JJ.
[1] The trial court did not impose a sentence on the one-year firearm specification in accordance with R.C. 2929.14(D)(1)(b), which prevents multiple sentences for firearm specifications related to the same felony.
[2] See State v. Wills (1997), 120 Ohio App.3d 320, 324, 697 N.E.2d 1072,1075; State v. Hairston (June 11, 1999), Montgomery App. No. 17218, unreported.
[3] See Simmons v. United States (1968), 390 U.S. 377, 384,88 S.Ct. 967, 971; Wills, supra, at 324, 697 N.E.2d at 1075.
[4] See State v. Jells (1990), 53 Ohio St.3d 22, 27, 559 N.E.2d 464,470.
[5] See Neil v. Biggers (1972), 409 U.S. 188, 199, 93 S.Ct. 375.
[6] Id.
[7] See Wills, supra, at 325, 697 N.E.2d at 1075.
[8] See State v. Moody (1978), 55 Ohio St.2d 64, 69, 377 N.E.2d 1008,1011.
[9] See State v. Waddy (1992), 63 Ohio St.3d 424, 438, 588 N.E.2d 819,830-831.
[10] The verdict forms were identical.
[11] See State v. Thompkins (1997), 78 Ohio St.3d 380,678 N.E.2d 541.
[12] R.C. 2923.11(B)(2).
[13] Thompkins, supra.
[14] See State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.
[15] State v. Barnes (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240,1247.
[16] R.C. 2945.11; See State v. Adams (1980), 62 Ohio St.2d 151, 153,404 N.E.2d 144, 146; see, also, State v. Comen (1990), 50 Ohio St.3d 206,553 N.E.2d 640, paragraph two of the syllabus (holding that "after arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.").
[17] See State v. Murphy (1990), 49 Ohio St.3d 206, 551 N.E.2d 932, syllabus. The firearm-enhancement provisions of R.C. 2929.71 discussed inMurphy have been repealed and are now contained in R.C. 2929.14.
[18] See, generally, the Ohio Jury Instructions, which contain the following pertinent instructions on operability:
 FIREARM. "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. "Firearm" includes an unloaded firearm and any firearm which is inoperable, but which can be readily rendered operable.
 CAPABLE OF EXPELLING OR PROPELLING. When deciding whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, you may rely on circumstantial evidence, including, but not limited to the (statements)(representations) and actions of the individual exercising control over the firearm.
[19] Hampton argues that the trial court was required additionally to define for the jury the following words and phrases: (1) "capable of expelling or propelling"; (2) "deadly weapon"; (3) "on or about his person or under his control"; and (4) "brandish." We agree that these terms should be defined as part of the specification charge. But, our finding of plain error is not based upon the trial court's failure to define words and phrases given in the charge. Rather, we find plain error based upon the court's failure to instruct on an element of the specification — the operability of the firearm.
[20] Adams, supra, paragraph two of the syllabus.
[21] See id., paragraph three of the syllabus.
[22] See Long, supra, paragraph two of the syllabus.
[23] See Thompkins, supra.
[24] Any exceptions to this rule would be specifically provided for by statute. 2 Katz Giannelli, Criminal Law (1995), Section 65.6. See R.C.2945.40 (allowing a jury to return the qualified verdict of not guilty by reason of insanity); R.C. 2913.61 (requiring the jury to determine the value of goods that have been taken during a crime).
[25] State v. Hessler (2000), 90 Ohio St.3d 108, 123, 734 N.E.2d 1237,1252, citing to State v. Robb (2000), 88 Ohio St.3d 59, 79,723 N.E.2d 1019, 1043.
[26] This rule provides, in relevant part:
 (B) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or an indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith.
[27] State v. Lovejoy (1997), 79 Ohio St.3d 440, 683 N.E.2d 1112, paragraph one of the syllabus.
[28] (1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, paragraph three of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911,98 S.Ct. 3136.
[29] (1932), 284 U.S. 390, 52 S.Ct. 189.
[30] Id. at 393, 52 S.Ct. 189-190, quoting Steckler v. United States
(C.A.2, 1925), 7 F.2d 59, 60.
[31] Id., see, also, United States v. Powell (1984), 469 U.S. 57,105 S.Ct. 471.
[32] See Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.
[33] Strickland, supra, at 687, 104 S.Ct. at 2064.
[34] See id. at 686, 104 S.Ct. at 2063.
[35] See id. at 694, 104 S.Ct. at 2068; Bradley, supra, at paragraph three of the syllabus.
[36] See Strickland, supra.
[37] Id. at 689, 104 S.Ct. 2065.
[38] See State v. Sage (1987), 31 Ohio St.3d 173, 182, 510 N.E.2d 343,349-350.
[39] See State v. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus.
[40] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[41] State v. Martin (1983), 20 Ohio App.3d 172, 485 N.E.2d 717.
[42] See State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[43] R.C. 2905.02(A)(2).
[44] (1997), 78 Ohio St.3d 380, 678 N.E.2d 541.
[45] Id. at 383-384, 678 N.E.2d at 544.